**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SIGNANT HEALTH HOLDING CORP.,**<br>**SIGNANT HEALTH LLC,**<br>**SIGNANT HEALTH GLOBAL LLC, and**<br>**SIGNANT HEALTH GLOBAL**<br>**SOLUTIONS LIMITED** | **CIVIL ACTION** |
|               **Plaintiffs,** | **NO.  24-709** |
|     **v.** | |
| **DANIEL DEBONIS,**<br>**HA63 LLC,**<br>**EMA WELLNESS, and**<br>**NATHAN BLUBAUGH,**<br>              **Defendants.** | |

## <u>MEMORANDUM</u>

**HODGE, J.**                                                                                    **June 18, 2024**

Before the Court is Plaintiffs Signant Health Holding Corporation, Signant Health LLC, Signant Health Global LLC, and Signant Health Global Solutions Limited's ("Plaintiffs" or "Signant") Renewed Motion for Preliminary Injunction (the "Motion") (ECF No. 54). The Motion seeks to enjoin the Defendants Daniel DeBonis ("DeBonis"), HA63 LLC ("HA63"), and EMA Wellness ("EMA")[1] (collectively, "Defendants") from disclosing, retaining, or using any of Signant's confidential or trade secret information  for the continued benefit and use of servicing the MindMed contract (including disclosing to others within EMA Wellness' organization). (ECF No. 54.) Plaintiffs also seek to enjoin Defendants from continuing any work on the MindMed contract. (*Id.*)

For the reasons that follow, the Court will deny Plaintiffs' motion for preliminary injunction.

---

[1] Counsel for Defendant Nathan Blubaugh filed an affidavit of service of the Amended Complaint on May 9, 2024. (ECF No. 51.) Signant's Motion does not seek injunctive relief in connection with its claims against Nathan Blubaugh. (ECF No. 54.)

## I.      BACKGROUND[2]

Plaintiffs in this case are Signant Health Holding Corporation, Signant Health LLC, Signant Health Global LLC, and Signant Health Global Solutions Limited. (ECF No. 34 at 1.) Signant Health Holding Corp. is a Delaware corporation headquartered in Pennsylvania. (*Id.* at 2.) Signant Health LLC and Signant Health Global LLC are both Delaware limited liability companies. Signant Health Global Solutions is headquartered in Ireland. (*Id.*) Signant Health LLC, Signant Health Global LLC, and Signant Health Global Solutions are all affiliates of Signant Health Holding Corporation. (*Id.*) Signant is a "globally recognized evidence generation company that primarily assists customers with clinical trials by providing a number of digital products that enhance and streamline clinical trials." (*Id.* at 5.) Defendant EMA is a Massachusetts limited liability company with its headquarters in Norwood, Massachusetts. (ECF No. 34 at 3.) EMA is also "an evidence generation company that assists customers with clinical trials." (*Id.* at 6.) Defendant DeBonis is a former Signant employee who resides in Massachusetts. (*Id.* at 2.) Defendant HA63 is a Massachusetts limited liability company owned by DeBonis through which he provided consulting services to Signant. (*Id.* at 2–3.)

DeBonis's work focuses on electronic clinical outcome assessment ("eCOA"), which is a method of capturing outcome data electronically in clinical trials. (ECF No. 45 at 12.) DeBonis's professional relationship with Signant began when he sold his company, Concordant Rater Systems, Inc., an eCOA start-up, to Signant's predecessor, Bracket (also known as UBC Specialty Clinical Services) in 2010. (ECF No. 55 at 10; ECF No. 45 at 12.) In June 2016, Signant and DeBonis entered into an employment agreement. (*Id.* at 11.) The terms set forth in the agreement stated that DeBonis would not:

---

[2] The Court adopts the pagination supplied by the CM/ECF docketing system.

- Retain or use Signant's confidential information whether during or after employment for his own benefit or the benefit of anyone other than Signant;

- Disclose, divulge, or reveal Signant's confidential information to anyone other than Signant;

- Disclose, divulge, or reveal Signant's confidential information to anyone outside Signant;

- Work for a competing business or engage in any competing enterprise against Signant for twelve months after leaving employment with Signant;

- Directly nor indirectly induce or solicit (or attempt to induce or solicit) any Signant customer or business relation from doing or continuing business with Signant;

- "Modify adversely" Signant's relationship with any Signant customer or business relation, nor "*in any way interfere*" with Signant's relationship with any Signant customer or business relation, whether existing or prospective; or

- Hire any person who had been a Signant employee within twelve months prior to the date of hire.

(ECF No. 55 at 11–12.) (citing 2016 Employment Agreement) (emphasis in original).)

EMA is an eCOA company that was founded in 2016 by some of Defendant DeBonis's former colleagues at Signant. (*Id.*) In January 2023, DeBonis was offered a position as EMA's Chief Product Officer. (ECF No. 45 at 12.) DeBonis accepted EMA's offer of employment in February 2023. (ECF No. 55 at 13.) Initially, DeBonis informed EMA that he was not subject to a non-compete clause based upon his employment with Signant, but after obtaining his employment materials from Signant, he discovered that he was subject to a non-compete that would prohibit him from joining EMA for twelve months from the date of his separation from Signant. (*Id.* at 12–13.) At DeBonis's request, Signant's Chief Medical Officer Dawie Wessels provided a letter granting DeBonis a waiver of the non-compete provisions contained in his

Employment Agreement specifically so that he could work at EMA. (ECF No. 18-3 at 2.) The

relevant portion of the letter reads as follows:

> It has come to the attention of Signant that you are intending to commence work
> for EMA Wellness. This letter hereby serves as confirmation that Signant will,
> upon the termination of your employment, waive the non-competition restrictions
> outlined in clause 6(a) of the Agreement for the purposes of your employment with
> EMA Wellness.

(*Id.*) DeBonis's employment with Signant ended on March 10, 2023, and he began his

employment with EMA on March 11, 2023. (ECF No. 45 at 12.)

On March 9, 2023, one day prior to the end of DeBonis's employment with Signant and

upon Signant's request, DeBonis agreed to continue working with Signant in a limited consulting

role. (ECF No. 45 at 12.) When he accepted the consulting position, DeBonis stated that he did

not want direct contact with any of Signant's customers to avoid any potential conflict. (*Id.*)

DeBonis's consultant position with Signant was governed by a Consultancy Agreement for a

term of up to six months, expiring on September 12, 2023. (ECF No. 45 at 13.) Signant and

DeBonis renewed the Consultancy Agreement for an additional six months on November 1,

2023. (ECF No. 55 at 12 (citing Renewal of Consultancy Agreement).) The Consultancy

Agreement included confidentiality and conflict of interest provisions:

> CONFLICT OF INTEREST. In order to avoid any conflict of interests, or
> the appearance of such conflict, Consultant hereby agrees that with the
> exception of work performed for Signant Health, Consultant shall not,
> anywhere in the world, directly or indirectly, design, create, license, sell,
> assign or otherwise transfer to or for the benefit of any other person or
> entity, or undertake, solicit or submit proposals or otherwise engage in
> discussions concerning the provision of services similar or comparable to
> the type of services contemplated or performed for Signant Health
> hereunder with any competitor of Signant Health.

> CONFIDENTIALITY. Consultant agrees that Consultant will not, directly
> or indirectly, during or after the Term, disclose in any manner, or use or
> permit others to use, any information or material regarding Signant Health
> any of its parent, subsidiary or affiliated companies, employees and/or

business or products, which information or material is compiled by, obtained by, or furnished to Consultant (whether received by Consultant before or after the Effective Date), and which is specifically designated by Signant Health as confidential and proprietary or which would reasonably be considered confidential or proprietary. It is understood that the foregoing obligation shall not apply to any part of the information which: (a) is or becomes generally available to the public (other than by disclosure by Consultant), (b) becomes available to Consultant or (c) is in the possession of Consultant as of the date hereof which Signant Health specifically has designated in writing as non-confidential.

(ECF No. 34-2 at 5 (Consultancy Agreement) (paragraph numbering omitted).)

Signant claims that DeBonis violated the terms of his Employment and Consultancy Agreements by "accepting a position with EMA and leading its efforts to divert the Phase 3 trial work to EMA." (*Id.* at 14.)

## II.    RELEVANT PROCEDURAL HISTORY

On February 16, 2024, Signant filed its complaint concurrently with a motion for a temporary restraining order ("TRO") and preliminary injunction. (ECF Nos. 1, 4.) On the same day Signant filed a motion to expedite discovery. (ECF No. 5.) The Court granted Signant's motion to expedite discovery on February 26, 2024 and set a schedule for briefing, oral argument, and expedited discovery. (ECF No. 9.) This order scheduled a hearing on Signant's motion for a TRO on March 6, 2023 and a hearing on Signant's motion for preliminary injunction on April 9, 2024. (*Id.*) The Court held a hearing on Signant's motion for a TRO on March 6, 2024. (ECF No. 20.) Following the hearing, the Court entered an order denying Signant's motion for a TRO. (ECF No. 21.)

After Signant filed its notice of intent to file an amended complaint on March 29, 2024, (ECF No. 30), Defendants requested a postponement of the hearing on the motion for preliminary injunction and a new briefing schedule to allow them to respond to the amended

complaint (ECF No. 32). The Court granted Defendants' requests and rescheduled the hearing on Signant's motion for preliminary injunction to May 9, 2024. (ECF No. 33.)

Signant filed an amended complaint on April 5, 2024. (ECF Nos. 34–35.) Defendants responded to Signant's motion for preliminary injunction on April 19, 2023. (ECF Nos. 42, 45.) Signant filed a reply in support of its motion for preliminary injunction on April 26, 2024. (ECF Nos. 47–48.)

The Court held a hearing on Signant's motion for preliminary injunction on May 9, 2024. (ECF No. 52.) During the hearing the Court requested that Signant refile its motion for preliminary injunction so that the motion would be tethered to the amended (and operative) complaint. Signant filed its renewed motion for preliminary injunction on May 13, 2024, (ECF Nos. 54–55), and Defendants filed their response on May 17, 2024 (ECF No. 56).

III.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 65 empowers courts to grant preliminary injunctions to enjoin harmful conduct. *See* Fed. R. Civ. P. 65(a). The Third Circuit has observed that four factors govern a district court's decision whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest. *See Allegheny Energy, Inc.*, 171 F.3d at 158.

The Supreme Court has characterized injunctive relief as "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "The burden lies with the plaintiff to establish every element in its favor," *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal*

*Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005), and, "[a]bsent a showing of irreparable

harm, a plaintiff is not entitled to injunctive relief, even if the other three elements are found,"

*Ferring PhaRM., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 219 (3d Cir. 2014).

A preliminary injunction is not appropriate if damages would be an adequate remedy. *See*

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988).

Furthermore, "[e]stablishing a risk of irreparable harm is not enough" to warrant the issuance of

a preliminary injunction. *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d. Cir. 1987); *see also*

*Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 358–59 (3d Cir. 1980) ("Risk of harm if

information is inadvertently disclosed . . . is not sufficient to satisfy the standard for granting a

preliminary injunction. There must be an imminent threat of the allegedly harmful disclosure."

(footnote omitted)). Instead, "[a] plaintiff has the burden of proving a 'clear showing of

immediate irreparable injury.'" *ECRI*, 809 F.2d at 226 (quoting *Cont'l Grp., Inc.*, 614 F.2d at

359). "The 'requisite feared injury or harm must be irreparable–not merely serious or

substantial,' and it 'must be of a peculiar nature, so that compensation in money cannot atone for

it.'" *Id.* (quoting *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)). Additionally, "where the

relief ordered by the preliminary injunction is mandatory and will alter the status quo, the party

seeking the injunction must meet a higher standard of showing irreparable harm in the absence of

an injunction." *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179

(3d. Cir. 2008).

## IV.   DISCUSSION

For Signant to prevail on its motion for preliminary injunction, it must satisfy each of the

factors set forth in the Third Circuit's four-part test. *See, e.g.*, *Allegheny Energy, Inc. v. DQE,*

*Inc.*, 171 F.3d 153, 158 (3d Cir. 1999) (citations omitted). In evaluating the evidence presented,

Signant does not meet its burden as the movant for preliminary injunctive relief. Specifically, the Court has determined after a close evaluation of the arguments presented in the briefings and at oral argument that Signant cannot satisfy the first two "gateway factors"—likelihood of success on the merits and irreparable harm. As a result, the Court need not, and will not, consider the remaining two factors. *See Greater Philadelphia Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116, 133 (3d Cir. 2020) (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) ("[A] movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits . . . and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief.") (citations omitted)).

### A.     Substantial Likelihood of Success on the Merits

Signant has not established a substantial likelihood of success on the merits as to its trade secrets, breach of contract, or tortious interference claims. Each is addressed below, in turn.

### 1.     Trade Secrets Claims

Signant asserts trade secrets claims against Defendants under both the Defend Trade Secrets Act ("DTSA" at 18 U.S.C. §§ 1836(b), 1839 et seq.) and the Pennsylvania Uniform Trade Secrets Act ("PUTSA" at 12 Pa. C. S. § 5301 et seq.). To establish a violation of either the Defend Trade Secrets Act ("DTSA") or Pennsylvania Uniform Trade Secrets Act ("PUTSA"), Signant must show that Defendants misappropriated a trade secret. *See* 18 U.S.C. § 1836(b)(1); *Clinical Servs., LLC v. Aeri Park*, No. CV 16-4896, 2016 WL 5912708, at *6 (E.D. Pa. Oct. 11, 2016). Both statutes define a "trade secret" as information that (1) derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use; and (2) that

the owner thereof has taken reasonable measures to keep the information secret. *See* 18 U.S.C. § 1839(3); 12 Pa. C.S. § 5302. Both statutes define "misappropriation" as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent[.]" *See* 18 U.S.C. § 1839(5); 12 Pa. C.S. § 5302. Signant alleges that Defendants misappropriated proprietary rater pricing and rater pricing methodology.[3] (ECF No. 55 at 21–22.) Defendants counter that these "vague and general references . . . fall short of the particularity required to state a trade secret claim." (ECF No. 45 at 20.) The Court agrees.

The Third Circuit has held that "it is first and foremost the plaintiff's burden to specifically identify what it contends to be its trade secrets and to demonstrate with record evidence a 'significantly better than negligible' chance of establishing the existence of those trade secrets." *Mallet and Company, Inc. v. Lacayo*, 16 F.4th 364, 385 (3d Cir. 2021) (citations omitted). As for more specific references to purported instances of misappropriation, Signant relies heavily on portions of an email sent from DeBonis to Stephen Saber, the Chief Operating Officer and Co-Founder of Defendant EMA Wellness. (*See, e.g.*, ECF No. 48 at 6–7.) The excerpt from the email presented and argued by Signant reads as follows:

> [T]he deliverable we are providing is the central rater. They should be trained and monitored, that's part of the deliverable of providing a central rater . . . Signant bundled it, so the 'cost' of an interview was like $400+. The question is whether we take that approach to keep it simple, or try to break out the training, monitoring, etc. as line items.

(ECF No. 29-28 at 2.) Signant described this email during oral argument as the "smoking gun" that clearly shows the misappropriation of proprietary information. (ECF No. 48 at 6–7.) While

---

[3] A rater is a tool used for data collection. In connection with Signant's work for MindMed in its Phase II trial, Signant used rater technology known as "Rater Station," to collect and analyze data from trial participants. Signant alleges that the pricing structure for the use of its rater technology and the methodology for developing that pricing structure is confidential and proprietary. (ECF No. 55 at 6.)

more specific than general references to categories of information provided elsewhere in Signant's briefing, this arguable "smoking gun" email still only makes a reference to cost "bundling" and to an estimation of an interview described as costing "like $400+." The term "like $400+" is an approximation. It is neither the specific amount used by Signant nor a disclosure of Signant's actual pricing structure and, thus, is viewed by the Court as a vague reference that does not demonstrate a "significantly better than negligible" chance of establishing the existence of trade secrets. *Mallet and Company, Inc.*, 16 F.4th at 385. Therefore, Signant has not established a substantial likelihood of success on the merits as to its trade secrets claims because the mention of an approximate monetary amount in the email Plaintiff referenced does not demonstrate to the Court that Defendant divulged its trade secret information.

### 2.  Breach of Contract Claim

Under certain circumstances, a preliminary injunction may be appropriate in a case involving a claim for breach of contract. *See, e.g.*, *Chicago Title Ins. Co. v. Lexington & Concord Search and Abstract, LLC*, 513 F. Supp. 2d 304, 313–14 (E.D. Pa. 2007) (granting motion for preliminary injunction based in part on claim for breach of contract); *Darius Int'l Inc. v. Young*, No. 05-6184, 2006 WL 1071655, at *20–21 (E.D. Pa. Apr. 20, 2006) (granting motion for preliminary injunction on claims for breach of contract and unfair competition). "When a preliminary injunction is sought based on a breach of contract, irreparable injury may be found in two situations: (1) where the subject matter of the contract is of such a special nature [or] of peculiar value that damages would be inadequate; or (2) where because of some special and practical features of the contract, it is impossible to ascertain the legal measure of loss so that money damages are impracticable." *Home Line Furniture Indus., Inc. v. Banner Retail Mktg., LLC*, 630 F. Supp. 2d 527, 540 (E.D. Pa. 2009) (quoting *ECRI*, 809 F.2d at 226). "[A] plaintiff in

a breach of contract case cannot convert monetary harm into irreparable harm simply by claiming that the breach of contract has prevented it from performing contracts with others and that this subsequent failure to perform will harm the plaintiff's reputation." *Bennington Foods LLC*, 528 F.3d at 178–79.

There are two potential contracts at issue here: DeBonis's employment agreement with Signant (the "Employment Agreement") and DeBonis's consultancy agreement with Signant (the "Consultancy Agreement"). (*See, e.g.*, ECF No. 55 at 23–24.) DeBonis and Signant entered into the Employment Agreement in June 2016. (*Id* at 11.) DeBonis and Signant entered into the Consultancy Agreement in March 2023 and subsequently extended that agreement for an additional six months in November 2023. (*Id.* at 12.) Signant argued that "[b]oth the Employment Agreement and the Consultancy Agreement are valid agreements that prohibit DeBonis from directly or indirectly diverting business away from Signant." (ECF No. 55 at 23.) If the Court were to accept Plaintiffs' argument, the Employment Agreement would arguably extend the limitations on DeBonis for an additional twelve months following his separation from Signant in March 2023. However, there is a provision within the Consultancy Agreement that Defendants point to which, according to Defendants, supersedes all other agreements. The provision within the Consultancy Agreement reads as follows:

> This Agreement constitutes the entire understanding of the parties with respect to its subject matter and supersedes all prior negotiations, understanding and agreements between the parties, and both parties acknowledge and agree that neither has relied on any representation or promise in connection with this Agreement which is not contained in this Agreement.

(ECF No. 34-2 at 8 § 17(a).) Pursuant to the terms of the Consultancy Agreement, it superseded the Employment Agreement, and consistent with the terms of the agreements, the Consultancy Agreement controlled. (ECF No. 45 at 23–24.) Signant does not concede that the Consultancy

Agreement superseded the Employment Agreement. (*See generally* ECF No. 55.) Rather, Signant maintains that along with the extension of the Consultancy Agreement through May 1, 2024 the non-compete clause of the Employment Agreement remained in effect for twelve months after DeBonis left employment with Signant. (ECF No. 55 at 12.)

Signant asserts that even if the Consultancy Agreement controls, DeBonis still breached (1) the confidentiality provision of the Consultancy Agreement by sharing Signant's rater pricing and pricing methodology; and (2) the conflict of interest provision of the Consultancy Agreement by providing services similar to the "type of services contemplated or performed" under the Consultancy Agreement to EMA, a company he knew to be a Signant competitor. (ECF No. 48 at 10–11.) However, Signant has not identified with sufficient specificity any confidential or proprietary information that DeBonis improperly shared or used in breach of the confidentiality provision for the reasons set forth above in Section II.B.1.a in connection with Signant's trade secrets claims. Thus, Signant has failed to establish a substantial likelihood of success on the merits based upon this breach of contract theory.

Additionally, Signant's contention that DeBonis breached the conflict of interest provision also fails. When Signant and DeBonis executed the Consultancy Agreement, Signant was made aware of and approved DeBonis's employment with EMA. (ECF No. 45 at 26.) Signant asserts that DeBonis fraudulently procured the waiver of the non-compete clause because DeBonis represented that EMA would not be competing with it. (ECF No. 55 at 7 (citing ECF No. 55-1) ("DeBonis told me that EMA Wellness would not be competing against Signant, that we might be working together with some clients, and that if any potential conflict of interest arose or if EMA Wellness *did* compete with Signant, he would notify me in writing.").) The Court is not persuaded. The Court concludes, based upon Dawie Wessels' email to DeBonis, that

Signant waived the non-compete clause with full knowledge that DeBonis would be working for EMA. Signant takes the position that "EMA was not a competitor of Signant until it hired DeBonis." (ECF No. 55 at 9.) In doing so, Signant seemingly concedes that *any* company that hired DeBonis would have become its competitor. Therefore, when Signant waived the non-compete clause and allowed DeBonis to seek employment with EMA, it did so with knowledge that EMA could become its competitor. Signant has therefore failed to demonstrate a substantial likelihood that it will succeed on the merits of its breach of contract claim.

### 3.     Tortious Interference Claim

Signant sets forth a tortious interference claim against Defendants based upon its assertion that Defendants "diverted" the award of the MindMed contract away from it. (ECF No. 55 at 23–24.) To establish a claim for tortious interference with existing or prospective contractual relationships, Plaintiffs must demonstrate: (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference. *See Acumed LLC v. Advanced Surgical Servs., Inc.,* 561 F.3d 199, 212 (3d Cir. 2009) (citing *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 530 (3d Cir. 1998)).

For Signant to prevail on its tortious interference claim it must demonstrate a reasonable likelihood that it would have won the MindMed Phase III contract *but for* Defendants' interference. While Signant argues that Defendants "diverted" the award of the MindMed

contract away from it, Signant is unable to overcome sworn declarations from MindMed submitted by its Director of Global Clinical Development, Todd Solomon, stating that Signant was never going to be awarded the Phase III contract, even if EMA was not in the running. (ECF No. 18-7 at 2 ¶ 8 ("After learning about Signant's allegations against EMA and DeBonis, I let DeBonis know that Signant was never even a finalist for the Phase III clinical trial contract and that if MindMed had not awarded the contract to EMA, MindMed would not have selected Signant as the vendor for its Phase III clinical trial."); ECF No. 45-3 at 4 ¶ 10 ("If MindMed had not awarded the contract to EMA, MindMed would not have selected Signant as the vendor for its Phase III clinical trial.").) Because Signant was never going to be awarded the contract for MindMed's Phase III clinical trial, Signant is unable, and has therefore failed, to demonstrate a substantial likelihood that it will succeed on the merits of its tortious interference claim.

### B.    Irreparable Harm

Irreparable harm "requires an imminent injury such that legal or equitable relief at the end of trial will not remedy the harm . . . Irreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it." *Bioquell, Inc. v. Feinstein*, No. CIV. A. 10-2205, 2011 WL 673746, at *8 (E.D. Pa. Feb. 16, 2011) (citations and quotations omitted). Signant's claim that it will suffer irreparable harm if this Court does not grant its request for injunctive relief focuses solely on DeBonis and EMA's continued work on the MindMed Phase III contract. (ECF No. 55 at 25–27.) At this juncture, Signant has not demonstrated that it could have received the Phase III contract even if EMA had not received it. In fact, the contrary is true; the declaration from MindMed makes clear that Signant was never going to be awarded the Phase III contract. (ECF No. 18-7 at 2 ¶ 8; ECF No. 45-3 at 4 ¶ 10.)

To the extent that Signant is able to prevail on a claim for losses in profits and revenue, its losses may be compensated in the form of money damages. To justify injunctive relief, the injury must "be of a peculiar nature, so that compensation in money cannot atone for it." *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) (citing *A.O. Smith Corp. v. F.T.C.*, 530 F.2d 515, 525 (3d Cir. 1976)). Signant's request for injunctive relief must therefore be denied.

## V.    CONCLUSION

For the foregoing reasons, the Court will deny Plaintiff's renewed motion for preliminary injunction. An appropriate Order follows.

BY THE COURT:

**/s/ Hon. Kelley B. Hodge**

**HODGE, KELLEY B., J.**